Good morning, Your Honors. Good morning, Judge Gould. This case is about water. It's about water in the desert. Water in the desert, as we all know, is the most precious resource in the desert. The case is also about Congress's intentions in passing the Clean Water Act. The two primary goals of the federal Clean Water Act is to maintain and restore the quality of the nation's waters. For waters that are of good quality, that quality should be maintained. For waters that are of not good quality, that are known as impaired waters, for those waters that exceed allowable standards, the goal of the Clean Water Act is to restore those waters. Now, all sides agree that Pinto Creek here in Arizona is an impaired water for copper. That means there's too much copper in the stream. So the question is, what does the Clean Water Act, what does Congress tell us to do, tell EPA to do? And in the implementing regulations for the Clean Water Act, the key one that we all know here is 40 CFR 122.4i, which says no permit shall issue, no new permit shall issue, if the new discharge will cause or contribute to a violation of the copper standard. The issue here is whether Carlotta's discharge from its mining operations will cause or contribute to a violation of the copper standard. The answer is yes. The key focus is on the point of discharge, when they're going to discharge and at the stretch of Pinto Creek where the discharge will occur. When that happens, when the mining operation starts and the discharge starts, the stream will have too much copper. The stream will still be impaired. Now, the fact that there's this Gibson offset or Gibson partial remediation, the Gibson cleanup, that will not change the fundamental fact that at the Carlotta site, five miles downstream, the stream will still have too much copper. And 122.4i says that if you're going to have a new discharge, it can't contribute to a water quality problem. We already have a problem here. The fact that the problem may not be, may not be, is some question as to whether the Gibson offset will actually make it all the way down, because there's all these other sources that have been there for years, other mines, active and inactive mines, contributing copper to the stream. So regardless of what happens, the finding of the EPA was that that this would be a net diminishment of the copper in the creek. If the Gibson site were cleaned up. Right. If you take the best view of the data from EPA. Yes. Don't we have to. Well, there is some concern here that at the Gibson site, we had raised these in our comments that they took one sample to base their entire analysis. So that's what I mean there. But let's just assume that there would be this net reduction in the overall stretch of the stream. There's nothing in the Clean Water Act of the regulations that talk about the overall stretch. You don't look at the from the headwaters all the way down to where it enters Phoenix's water supply. What you do is you look at the point of the discharge and at the point of the discharge. Regardless, assuming that the Gibson cleanup is 100 percent effective, that they get every ounce of copper out of that is being discharged into way up for Pinto Creek, a tributary action to Pinto Creek at the point of discharge. The cause of contribute will still happen because at the point of discharge, all of these other sources of copper, the BHP active operation in these old inactive mines are still discharging copper. They're discharging copper today. So those who have there's no plan to clean those up. Those will still be discharging copper. And even though if you look at the stretch of stream for miles and miles and miles, will there be a net reduction? Yes. What will happen at the Carlotta site? And that's where the new discharge is going to occur. Now, EPA relies pretty much exclusively on this offset theory, but that's what it is. It's a theory. There's nothing in the Clean Water Act. There's nothing in the regulations. Well, how about the Supreme Court's case in Arkansas v. Oklahoma? They rely on that heavily. First of all, Arkansas v. Oklahoma was not dealing with a new discharge. Section 122.4i didn't even come up. It was not at issue. And that's the regulation here. A new discharge into an impaired water. Also, if you really look at Arkansas v. Oklahoma, the reason why the court held the way it did and allowed the discharge to occur is it was a de minimis discharge. It was not even measurable. So I think the Supreme Court's decision was perfectly good in Arkansas because they said, well, we're not going to, you know, put controls on these discharges when we can't even measure. Well, isn't this the question in light of the Arkansas case? Well, whether the EPA's construction of the Clean Water Act, that the act permits this offsetting principle, whether that is, you know, is entitled to some deference. Yes. The agency's interpretation of its regulation is entitled to deference. But that deference is does not is not afforded to when the agency is essentially creating an exemption from the Clean Water Act. I think Judge Gould's decision. What do you mean by that? Are you characterizing the offset as an exemption? Is that what you're saying? Yes. It's an exemption from the requirement that when the discharge occurs at the Carlotta site, will it contribute to a violation of the copper standard? Yes. They're adding more copper to a stream that can't handle any more copper. So I think so. What you're saying is that is not the EPA, but the Clean Water Act does not permit this. This offsetting approach. Right. It's contrary to the statute. That's your position, right? Contrary to the statute and the regulations. I think Judge Gould's decision in a very important case, the Northern Plains Resource Council case, Judge Gould, the coal bed methane groundwater discharge case, their EPA in the state of Montana had created an exemption for discharges of groundwater that was being diverted into the stream. And I think the Ninth Circuit correctly and unanimously held that there's no such discharge. I mean, no such exemption. So I think the fact that, of course, there's always deference given to the administrative agency. But look in the regulations. Look in the act. Is there any mention of this offset theory? No. The best that Carlotta and EPA can come up with is a brief EPA submitted to a district court in Louisiana a number of years ago. And importantly, some language and preambles to draft regulations that never got implemented. Those certainly do not have the force of law under administrative law. We have to go with the statute and the regulations that we have and we can't create manufacture this offset theory. Now, I think the even though it's, of course, not binding on this course, the recent court, the recent case in Minnesota, the Annandale case squarely rejected every single argument. There is no offset theory. It looked at the Arkansas, Oklahoma and said that case doesn't even apply. It's not a one twenty two point four. Let me ask you this. Suppose that hypothetically that the cleaning up of the Gibson mine upstream would have been cleaned up a whole lot of copper. That's different than the situation here. But suppose it had been, say, good up half. And the new the new contribution of copper by this Carlotta mine was only going to be about 10 percent. So we're going to clear up half. And the addition at Carlotta is only going to be 10 percent. You mean we couldn't have that kind of an offset? Now, if one thing, the Gibson site should already be remediated. It's subject to the Clean Water Act, and that mine should have been cleaned up a long time ago. EPA has chosen not to regulate the mine site. But let's assume it's an abandoned mine. Well, there's still an operator under the 10th Circuit Sierra Club versus El Paso mines case. Abandoned mines are required to get Clean Water Act permits. That's the case. I litigate in the 10th Circuit. And it's very clear. So that mine should have already been cleaned up. So what EPA is saying now, regardless of the fact that the stream is violating standards down below five miles downstream, we're going to have this offset. But the question is, what's the status of the stream in the Carlotta reach, not way up in the headwaters on a tributary to Pinto Creek? What's Pinto Creek look like at the point of discharge? And at the point of discharge, all sides agree that when Carlotta begins operations and starts discharging, the stream has too much copper and the offset. That's too much copper now. It has too much copper now. That's right. And will it have a little less copper? Best case scenario, yes. It will have a little less copper. That's not the point. The offset series sounds good on paper, but paper doesn't solve the problem. Paper doesn't implement the Clean Water Act congressional intent, which says is when you have to restore streams. You can't allow new discharges to streams that can't handle it. Can it handle it better than what the Gibson offset may be? But still the stream, because of these other sources, the other mine sites, the BHP active big open pit operation, is just upstream from Carlotta. We have the Henderson Ranch mines. These other abandoned mines in the air are all discharging copper into Pinto Creek. And they're going to continue to do that. And that stream is still way above the copper standard. And the offset really isn't going to do it. Now, if there was an offset theory in the regulations or in the act, then we lose this issue. But we have to look at the regulations. EPA just can't say that we have an offset theory under the Clean Water Act. It's just not there, Your Honor. And this goes. There's nothing in this statute for the regulations that expressly prohibits an offset. Right. There's nothing in the regulations either way. I think what you have to do is look at 122.4i, which says no permit shall issue. That's a strong directive against discharges. And then further on down in 122.4i, no permit shall issue at the beginning of 122.4i says if the new discharge, 122.4i is just new discharges, if the new discharge will cause or contribute. And when that new discharge comes online, it's going to contribute to the copper standard. And there's even other discharges. You know, we don't have time here to talk about all the discharges that we say are unregulated. But there's other copper sources as well from the diversion channels, from the rock that's in the area. These are completely unregulated. The only thing that EPA did here was allow Carlotta to discharge up to the maximum level of the standard. Full copper standard. Carlotta is allowed to discharge, essentially ignoring the fact that the stream has too much copper from all these other sources. Do the citizens in the area support the Gibson cleanup? You bet. We're not arguing here that we're somehow nitpicking the Clean Water Act to try to, you know, come up with a legal victory. What we want is that stream restored, as we think Congress says. And I think restoration means when the stream has too much copper, you don't add more copper. Now, they did the TMDL. In fact, they didn't do the TMDL until 2001, after we had already submitted our first petition and commented at everything. Then they did the TMDL. And then they said, well, we've got all these other copper sources we have to get down. We're going to do one of them. No plan to do the other ones. And even though we support the Gibson cleanup, the statute still says, and particularly the regulations say that you have to protect the stream and you have to restore the stream. And, you know, some of these other issues that are related to this, the diversion channels are new sources of copper they didn't even regulate. And so we're going to build a huge retaining wall down to bedrock. So when the groundwater comes down, it's going to well up and then be diverted into these diversion channels. And the record is very clear that that contains or above the limit for cadmium and certainly above the limit for copper. That's the issue that at least your opponents say was not brought up in the, you know, appropriate comment period. It's interesting, the argument there. First of all, they say that the fact that the EPA was aware of these issues from our other comments on the TMDL in 2001. That's irrelevant. The EAB did not look at that issue because they said we should have raised it in the 1998 comment period. Well, the 1998 comment period, the TMDL wasn't even issued until 2001. How could we raise issues about copper loading and stuff like that? It was a recent case that just came out from the Ninth Circuit. I just found out about it, which supports our view, which as long as the EPA was aware of the issue, it's I'm going to I'm sorry for the language. It's Iliu Kalani Coalition versus Rumsfeld from back last month, which said as long as the EPA had independent knowledge of an issue, it's properly before the court. And the fact that we submitted comments on the TMDL and these other issues to the same EPA officials. And when we bring it to the EAB, they say, well, we're not going to look at that because you should have raised it in the 1998 comments. We think that EPA can't have it both ways. They use the TMDL and all the copper loadings in the Gibson offset to support their view that the Clean Water Act will be met. Yet when we tried to raise issues on the TMDL, they said, well, we can't hear that. And neither can the Ninth Circuit. And we think the EPA can't have it both ways. Remember, another section that hasn't been talked about too much in 122 for I, which says that the pollution load allocation has to be done and it has to be demonstrated by Carlotta to be in place prior to the close of the comment period. Close of the comment period was in 1998. It wasn't even done yet until 2001. And now we're saying we should have raised all those issues in 1998. If they want to live or die by the first comment period, then the whole offset, the whole TMDL, all the data dealing with copper loadings basically came in too late. So if they want to live by that sword, they should die by that sword. So I understand this argument that there is going to be a wall erected down to the base rock bedrock that will cause the flow of the underground water to go into the diversion that's being built around, around the pit, around the back into Pinot Creek, down below the pit. Because if you're, if you've ever seen an open pit mining operation, the last thing you want is water coming out of the rock and the groundwater filling up your pit. The mine engineers will say, that's one thing you don't want. So that's what they're doing. They're taking the groundwater, keeping it away from the pit and then diverting it down into Pinot Creek later. And that's a serious problem. The copper, according to the data, the copper in that groundwater alone violates the standard. Forget about, you know, the offsets or anything. That copper is already above standards. And when it comes in, it would normally go into the pit. But now they're going to take it, prevent it from going in the pit and they're going to put it in Pinot Creek, which would not have been but for their their operations in their diversion channel. And that water violates the standards in and of themselves. Unless there's any questions, I'd like to remain, say the remaining time. Thank you very much. May it please the Court. I am Judith Keith, representing the United States Environmental Protection Agency. Also with me is my co-counsel, John Most. Mr. Most will address the NEPA issues. I will address the Clean Water Act issues. I will take 15 minutes of the argument. Mr. Most will take five minutes. Keep track of your own time. Yes, Your Honor. I just wanted the Court to be aware. Right. And I will not address the issues of the Arizona, compliance with the Arizona anti-degradation standards or Petitioner's waiver of claims unless the Court has specific questions about those areas. I will focus on the compliance with the Clean Water Act and Section 122.4i. The petition for review should be denied. As the EAB held, in issuing a national pollutant discharge elimination system permit to Carlotta, which I will refer to as a NIPTES permit, EPA complied with the Clean Water Act, and it complied with Section 122.4i. It met Arizona's anti-degradation requirements, and Petitioner waived a variety of issues. Contrary to Petitioner's contention, pursuant to Arkansas v. Oklahoma, the Clean Water Act does not categorically prohibit discharges to impaired waters. Instead, as Arkansas held, those discharges are allowable, and the Court there specifically reversed a finding of the Court of Appeals to the contrary. Petitioners, in their reply, have incorrectly construed Arkansas, and Arkansas specifically did hold that discharges to impaired waters are not categorically prohibited. The other holding in that case was specific to that case, which was the holding that where you have detectable concentrations of, where you don't have detectable concentrations of pollutant found in receiving waters, whether or not that kind of discharge violated the permit in that case. That was a specific separate holding in that case from the finding that the Clean Water Act does not expressly prohibit discharges to impaired waters. EPA's interpretation, Petitioner's interpretation is also contrary to the regulation's plain language. The 122.4i specifically states in it that where you have a TMDL, that discharges are allowed if you show that the compliance schedule requirement is met and that there are sufficient remaining pollutant load allocations, and we have- You say a CWL. I'm sorry? When you have a CWL, is that what you said? A TMDL, sir. Oh, a TMDL, okay. Total maximum daily load. When in 122.4i, where it says that the State has to assign pollutant load allocations, those pollutant load allocations are the TMDL. Well- Go ahead. That regulation, though, also says you can't permit it if it's going to cause or contribute, right? That's correct, Your Honor. And as we show, there is no the cause or contribute standard is met here in the Gibson Mine remediation. Well, Mr. Flint, you have to determine whether it's going to cause or contribute at the point where the new source is going to discharge. Well, Your Honor, we believe that that's an erroneous argument on the part of Petitioner's. The regulation specifically under, for example, the compliance schedule requirement, talks about the segment. The TMDLs specifically deal with segments of the reach. And under the 303D list, Clean Water Act 303D list, where you list impaired waters, those also specifically deal with segments. And based on all of those things, we believe that the correct standard is whether or not it will impair the segment. In addition, Petitioner's argument fails in terms of their arguments about all these other sources. What they are discharging to is the segment. So you have to look to the segment to determine whether or not there is compliance. Well, if you have an impaired stream and you're contributing more copper pollutant, why isn't this contribution true? Well, Your Honor, under Carlotta's permit, first they're expressly prohibited from discharging until after the discharging anything that has any detectable concentrations of copper until after the Gibson remediation is complete. Until after what? I'm having trouble hearing you. After the Gibson remediation is complete. Can you hear me now, sir? Yes. Okay. And secondly, the permit expressly prohibits discharges that exceed the from exceeding the applicable numerical water quality criteria for copper. Third, Carlotta's discharges are going to be extremely rare if they have any discharges at all because they're restricted under their permit from doing any discharges other than during extreme storm events, which are storms that occur in a 24-hour period on average at every 100 years. And the record also shows that the Gibson mine unremediated discharges far exceed those of Carlotta and that all of the data that EPA carefully examined demonstrates that. And this Court should defer to EPA's technical determination because EPA's technical determinations are entitled to substantial deference. So there is no contribution at all except in the case of those rare storms? They are prohibited. Yes, sir. They are prohibited under their permit from discharging except during those extreme storm events. So no discharge at all? That's correct. Okay. How about the argument that was made earlier about the wall and the underground water that diverted into the diversion creek? Your Honor, as the Petitioner indicated, what the EAB found was that issue was waived because it was not timely raised below, and that issue respectfully should not be addressed on the merits by this Court. But if the Court determines that that issue needs to be addressed on the merits, then it should be sent back to EAB to first decide because EAB did not decide that issue on the merits. With respect to Petitioner's arguments concerning the Annandale decision and Petitioner's reliance on that decision for their arguments in their reply, that case was simply wrongly decided. First, that case applied a de novo standard of review, and since EPA was not a party, but if EPA had been a party in that case, the Court would have applied a totally different standard of review and would have deferred to EPA's interpretation of its own regulations. Secondly, that case misinterpreted EPA's 2000 proposal to amend the 122.4i as to offsets. What EPA was doing in that amendment was dealing with whether or not it should require an additional offset over and above the offsets that it was already requiring under 122.4i. So the Court's determination there that EPA's determination not to require an additional offset that would have applied uniformly to a small class of dischargers has nothing to do with whether or not EPA has the discretion and does exercise that discretion properly to require offsets. In addition, the Court's one-line holding that there is no indication that a discretionary system of offsets is allowed should be rejected by this Court because the Court there offered absolutely no support for that one-line statement. And as we've shown, Carlotta's discharges will not cause or contribute to a violation of water quality standards, as we demonstrate in our brief. And as I indicated earlier, the Carlotta is not permitted to discharge at all until after the Gibson Mine remediation. Until after what? Until after the Gibson Mine remediation is complete. And the record clearly shows that the Gibson Mine remediation will result in substantial reductions of copper loadings to Pender Creek. The record also shows that that remediation is feasible and will be successful. How do we know that with the other permit holders on this creek that the aggregate discharges will not exceed the total maximum allowed under state law? Well, the permit, BHP copper is the only other permitted point source discharger, and the record reflects that BHP copper is complying with its permit limits with respect to discharges of copper. Well, when the Carlotta segment is in operation and you've got BHP complying, plus you have other sources of copper, or if you do, how do we know that the total maximum would not be exceeded? I'm not sure I understand the question, Your Honor. If the Court is asking. Okay. Well, you've got Carlotta with a permit, and then you've got what, BHP with a permit? That's correct. Then you've got some other old closed mines that are not subject to permits, but which might have copper leach out of their area in a big storm, I assume. Well, Your Honor, I'm sorry, were you done, Your Honor? I'm just saying, if you put it all together, maybe I'm being too simplistic in this, but it seems that whether Carlotta would contribute to pollution would depend on these other actors or other sources as well, what the aggregate was. Well, Your Honor, you do look to the segment of the river, but in terms of the compliance with the water quality standards, first, these other mine sources are not point sources, and EPA's authority under the Clean Water Act is limited to regulating point sources. Secondly, when you're- What is a point source? What is a point source? Well, it's where you have discharge from a discrete conveyance. Like a pipe, let's say. Yes. Right, like a pipe. I understand, but whether the Carlotta discharge from its point source is going to cause or contribute to pollution depends upon the amount of pollutants from all sources, right? Not just point source. Not just ones that come out of a source that EPA can regulate. Well, Your Honor, the TMDL sets waste load allocations for all the various sources, and the TMDL found here that with the Gibson Mine remediation, the water quality in Pinto Creek would improve, and therefore any discharges, the rare discharges that Carlotta will have or may have, would not violate water quality standards in the river. So the TMDL found that even looking at all those other sources, that with the Gibson Mine remediation, any of Carlotta's discharges will not be compliant with the Clean Water Act and 122.4i. But it would never clear up Pinto Creek? I beg your pardon? But Pinto Creek would always be an endangered creek? Well, Your Honor, the States have the obligation to implement the TMDLs, and if the State implements the TMDL here, then Pinto Creek would meet water quality standards. Even with those non-point source abandoned mines? I believe that is the case, Your Honor, because I believe that what they found in the TMDL was that the Gibson Mine remediation was the overwhelming other mine site source discharges of copper to Pinto Creek. And I note that I'm at my five-minute mark, so with the Court's indulgence, I will turn it over to Mr. Mose. Good morning, Your Honors. John Mose for EPA. I'll be briefly discussing the NEPA issues raised in this case. As the EAB found, the Supplemental Environmental Impact Statement in this case, which is being challenged, or the SEA as I'll refer to it, took the required hard look at the impacts of the two new permit conditions, studied a reasonable range of alternatives given the fact that this is not a significant environmental impact, these two conditions, and it made its analysis known to the public, and it received public comment, and it responded to those comments. Those are the procedural requirements of NEPA. Now, I'd like to mention just a word on the genesis of this SEA. In response to comments on the draft permit during the first public comment period, the EPA added these two conditions, one being the Gibson Mine remediation and the other being the groundwater discharge through outfall number eight to augment stream flow. That second condition doesn't, I'm not sure I understand that. During Carlotta's operations, they will be drawing water from well fields. Well fields contribute to the levels of water in the stream through the alluvium, which is at the sides of the stream. There is a possibility that the use of water that Carlotta will be making will have an effect of lowering the level in the stream, and so the permit requires them to take water from other well sources and pump it into the stream to maintain the levels for the habitat. Now, in their first petition for review, many of these petitioners contended that neither of these conditions had undergone NEPA analysis, and so the EPA dutifully withdrew the conditions and conducted a very narrow and limited NEPA analysis. And this is consistent with the NEPA regulations, which the theme of which, and there's numerous provisions that demonstrate this, is you want to reduce paperwork. NEPA is not supposed to be a paper exercise. If other issues have already been analyzed, when new events or developments occur, it is not necessary to reinvent the wheel, so to speak. So the analysis was done. They looked at whether an EIS was required. They concluded that it was not a significant impact on the environment, and they did so in a 52-page SEA. And the conclusion of which was that the overall outcome of this narrow decision, whether to include or not to include these two conditions, would have a significant environmental effect, and they concluded that it would not. In fact, they concluded that it would be beneficial. Now, petitioners are challenging this decision on several bases. One is the fact that we adopted prior NEPA documents, that we didn't look at impacts and that we didn't look at a sufficient range of alternatives. As for adoption, the regulations clearly allow it. By the way, so that you are not concerned with the time, we'll give you an additional 10 minutes. You were supposed to have 15, so. Oh, thank you, Your Honor. I appreciate that. Regarding adoption, as we explained in our brief, the NEPA regulations specifically authorize this for the purpose of simplifying the process, reducing paperwork, and I'm referring to the regulation at 1500.4. It gives a long list of different methods of reducing paperwork. As for the limited focus of the SEA, the EAB properly concluded that it was appropriate for the agency to focus, in its supplemental EA, on those issues that were to focus solely on the issues that were before the agency. Petitioners are trying to make this into a new, like we're starting over. We're going to reanalyze everything. This is not what we're required to do at this point. At this point, we are simply assessing the decision whether to include or not to include the two additional and beneficial conditions. As for the alternatives, this Court has held that a rule of reason governs the agency's decision in regard to the range of The Supreme Court has also ruled in the Vermont Yankee case that it's within an agency's discretion to determine the appropriate number of alternatives. And in our brief, we cited a couple cases that stand for the proposition that where the impacts of an operation or a project are expected to be minimal, a smaller range of alternatives may be considered. Now, here, what we consider were essentially three alternatives. The first was the no-action alternative, under which the permit, as previously approved, would be issued without these beneficial conditions. The second alternative was the permit that was previously approved. I thought that they had said only with these conditions to be considered. The permit had many conditions. Two were added late in the process. There was the objection. They withdrew the condition. But the permit was otherwise approved in a record of decision and issued. Otherwise approved, but not approved totally. Correct. We withdrew the condition. And under NEPA, we're entitled still to rely on the analyses in the Forest Service FEIS that supported the previous decision. So, I mean, technically, I could see where you could certainly rely on them, all the things that were brought up there. But it's puzzling to me how you don't have to consider the entire package with the new conditions as well. Well, that was the point of the withdrawing of the conditions, the supplemental analysis, and the final record of decision, which adopted the original FEIS, the Army Corps of Engineers environmental assessment, and the new environmental assessment that EPA did. So it is a complete package in the final decision. Yeah, but what puzzles me is that when your opponents are prevented from arguing the total package because they didn't make the comment at the appropriate time, that seems odd to me. Well, the courts have upheld issue preservation requirements. And the purpose of them is that an environmental review process needs to be an interactive process. It's specifically made public so that the public can participate. And it sort of goes both ways. The agency informs the public. The public informs the agency. And they work together to come up with something that makes sense for everyone. It's just the state of the law on that point. It's permissible. Getting back to the alternatives, under the proposed action, the two conditions would be added. And then the final alternative that we looked at, that the EPA looked at, was removing the Cactus breccia ore body. We discussed in the brief. That was initially considered but was eliminated from detailed consideration because it was not viewed as a technically feasible means of providing an offset. So in compliance with NEPA regulations, the agency explained why they were not considering that as a formal alternative. Just so I understand factually, were the comments made in connection with the two new conditions, were the comments made about this wall that's being put in and the diversion of copper from the groundwater at that time? The only NEPA comments that were made during the first public comment period related to the failure to do NEPA analysis on the two conditions. How about the second comment period? I need to check my notes on that, Your Honor. I may have just made a mistake. Excuse me. Well, that's all right. We'll look that up. In their briefs before this Court, the Petitioners point to various impacts and alternatives that they say should have been considered. And we explain in our brief that these concerns were not properly raised before the agency and many of them need not even be considered under NEPA. I'll be happy to answer any questions you might have on those specific comments. I have a list here of them. But I won't take the Court's time unless the Court wishes to. Just in sum, the Arizona District Court studied, heard a challenge to the FEIS, which is the main environmental document that supports this action. And they rejected the challenge, and they noted that there's a rule of reason that governs in a court's assessment of a NEPA document. And this is also language that the Supreme Court has used in the public citizen case that we discuss in our brief. The Court must determine whether an action or whether the NEPA document, quote, reasonably contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. And I'm quoting from Oregon Environmental Council v. Koonsman. Despite this standard, Petitioners are attempting to fly-spec the analysis. They seem to insist upon absolute perfection in the NEPA document. And they belatedly identify these issues that they say that should have been raised under EPA regulations during the at certain points in the administrative process. This is a distraction from the real issue before the Court on NEPA, and that is whether the EPA properly limited its analysis to the environmental impacts of including the two new conditions. EPA's focus was necessarily and legitimately narrow and should be upheld. All right. Thank you, Counsel. Your Honor, one last moment, if I may. I wanted to introduce Mr. Richard Tobin from the counsel for Carlotta. And if he is available to answer any questions that you might have for him. All right. Thank you. Any questions? All right. Your Honor, may I respectfully request the additional five minutes so we each have the 25 minutes? Certainly. Okay. Thank you very much. I think some of the Court's questions to EPA were right on point. Judge Gould talked about how do we know that the aggregate sources will not exceed the copper limit? Well, they won't. Oh, excuse me. The aggregate sources will exceed the copper limit, even with the Gibson remediation. Now, it's interesting. The EPA pointed out that the BHP mine just upstream from Carlotta basically is discharging in compliance with their permit. But their permit allows them to discharge to the full standard of copper in the stream. Now, 122.4i talks about compliance schedules that in order for that whole scheme to work, existing permitted sources dispute as to whether the sources are permitted or not. But even taking EPA's view, existing permitted sources have to have a compliance schedule to ratchet down their copper. EPA didn't touch the BHP copper discharges. So the BHP copper discharges alone takes up all the copper limit. They're allowed to discharge to the full limit. That does not even account for the other sources up in the stream. Now, if you look at the case law from the Ninth Circuit and the Tenth Circuit. I'm not sure I understand this other mine, the BHP mine. You say that the amount that they are allowed to discharge would exceed any amount that the Gibson mine, for example, would lessen? Gibson, the BHP mine, is allowed to discharge up to the full copper standard for Pinto Creek. And I assume they're doing that. So there's no more room for any more copper. So that's why these other sources, these old sources, they're not speculative. Those are discharging. The TMDL found that there's pounds and pounds of copper coming in daily, that with the BHP mine plus these other sources, the maximum amount is exceeded. The aggregated amount exceeds the standards, regardless of what Gibson does. They're focusing on this large, they call it the Pinto Creek segment. EPA's permit almost, if you look at it, their argument acts as if the Carlotta discharge is right at the Gibson site. So if we clean up the Gibson site, the stream is back to health, the stream meets standards, and Carlotta can add some copper. That's not the case. It's five miles downstream. In fact, at some low flows, the record shows the Gibson cleanup, the Gibson source right now, the copper loading, doesn't even reach the Carlotta site during low flow times. At high flow times, they do reach it. But there will be some reduction of copper. Ms. Keith talked about that the stream will be improved. That does not mean in compliance. That does not mean that the new copper discharges are going to, that they won't cause or contribute to the standards violation. And there's no dispute that regardless of what happens up at Gibson, 100% effective, 50% effect, doesn't matter. Down at Carlotta, the stream will have too much copper in it, and new copper will cause or contribute. Yes. With the permits for BHP and for Carlotta, would those allow double the maximum load in the creek? Well, the TMDL basically, done in 2001, sets up all the amount of copper that the various sources, Gibson, BHP, Carlotta, these other sources, the Henderson Ranch mines and some other ones, it sets the maximum amount. And then it says, okay, here's what's being discharged now. Here's what has to be reduced at all of these sources to get the stream back to standards. And EPA is only requiring one cleanup, and that's Gibson. The other ones are not going to be cleaned up. There's no plan. Maybe in 10 or 15 years, if the state of Arizona gets around to it, according to EPA, we might have some cleanup. But right now, and when Carlotta starts operation, that stream is going to have too much copper in it. And to say that maybe down in the future we're going to have some cleanup and everything will be great, that's just total speculation. The stream violates the standards now. And the TMDL says everything needs to be ratcheted down in all these sources. And those old mine sources actually are point sources. The Ninth Circuit and the Tenth Circuit, the circuits out west, have said that mine tunnels, mine dumps and stuff are all point sources. Those should be all regulated. Kennedy, your point of view, in contrast to opposing counsel, is that the abandoned mine sites are point sources that can be regulated? Yes. Really, it doesn't come up, because under the TMDL process, the Ninth Circuit Ponsolino case, the Myberg case and the Eleventh Circuit, the TMDL looks at both point and non-point sources. And the state and EPA can go in and clean up non-point or point. So that's ñ I didn't want to get a distraction as to whether they're point or non-point. They are copper loading. Copper loading is happening now. It's going to happen for years. You know, the EPA talked about the Cactus Bracia formation. That is currently ñ it's rock that is heavily laden with copper. It is currently leaching at the Carlotta site into the stream. That's going to happen during the first few years of mining. There's no plan to clean that up. They didn't even factor that into the permit. So there's a lot of copper sources coming in here. The groundwater is going to be a continuous source of water. Sixteen gallons a minute forever.  DR. ROSENFELD, JR. One thing that I was interested in is opposing counsel said that there will be really no contribution at all from the Carlotta mine except in these unusually rainy years. MR. BARROWS Well, that's the desert for you. That's the desert for you in Arizona. If you've ever been down there in the monsoon, those ñ those rains can be torrential. And in fact, the Gibson mine doesn't even discharge much at low flows. So I think they're trying to argue that now they're saying, well, there is no Carlotta discharge. There's a discharge. They're permitting it. If there wasn't a discharge, there wouldn't be a permit. They can only ñ they only have authority to permit discharges. Carlotta would have a very good lawsuit if EPA required them to get a permit where there's no discharge. That's very standard in Western mining operations in the arid environment, Nevada and Arizona here in the Ninth Circuit, when a lot of these discharges are for when you have the monsoonal flows or heavy rains. And that's what's causing the copper to be violated in Pinto Creek. It's not Seattle, as Judge Gould knows, where it rains a lot. It rains in big bursts. And that's where the copper is coming from. So there is going to be a discharge here. So when the rain is over and the creek is restored, there wouldn't be an excess copper? Well, at very low flows, maybe. But the record doesn't show that. The TMDL shows that the stream is impaired. Arizona has declared this an impaired water. They don't say for six months of the year or during the monsoon it is an impaired water that has too much copper in it. And the new copper discharges from Carlotta, whether it's the one that permitted, they permitted, the ones that they didn't permit, particularly the groundwater welling up, that's water that's going to violate the standards. Now, EPA wants to talk about the big segment and everything like that. But we focus on the point of discharge. There's nothing in the regulations. There's nothing in the Clean Water Act that says you can look somewhere upstream and pretend that's where your new discharge is. You really don't. I'm not sure how much time I have left. I just want to talk about the NEEP issues. You've got three minutes and 47. No, let's see. It's going backwards. Yeah. So how much? I have like another minute or two, two minutes. If there's any questions on the TMDL issues, the maximum amount and stuff like that, I'd be happy to answer. I just want to spend the last couple of minutes. Does the record show how often those big, as you put it, monsoonal floods occur? No, the record. It talks about the hundred year flood, but that doesn't mean it's only going to happen once every hundred years. That's what I wonder. Yeah, what it means is, is that based on a certain amount of flow on based on an average, that that's going to happen. But that you can have it every two years. You can have every three years and then you have a drought. So the record doesn't show. And every two or three years, it's going to be 300 years till the next one. Well, you know, it reminds me of the statistician who couldn't swim that drowned walking across the stream with an average depth of three feet. So, you know, that that hundred year flood is something that, you know, it's not like Noah's Ark. It comes. And if you've ever been down in the monsoon when it rains in Arizona, you'll understand the issue there. I think just look at the facts. The stream is basically most of the copper and most of the pollutants get washed off these old mine sites during when it heavy rains. Now, if all of these like BHP and these others are designed to withstand the hundred year flood, you wouldn't have any copper problem. You have a copper problem because it's washing off when it really rains. Now, the stream walked Pinto Creek and there are some dry structures during parts of the year, but there's some stretches where it's flowing and there's fish and everything. Some sensitive species mentioned by the Forest Service. So your time is expired. OK. I have a question. Yes, sir. What would a what would a compliance schedule that was designed to ensure that the total maximum daily load was not exceeded? What would such a schedule look like? Well, part of it would be the first part would be the Gibson. Let's clean up Gibson. And then Gibson's a site where it has its problems. So I think that will take many months to clean up some of these other sites, I think, that are not permitted right now. The old mine sites, I think, with a few months worth of work, you could go in and clean these up and then also tell BHP to reduce some of their copper loadings. The team deal sets this out. It says if we get all of these down, then the stream can handle the new Carlotta discharges. The ones they regulate. Are you saying are you are you saying that the EPA could regulate the closed down mine sites, that they are point sources? Well, the EPA is ultimate authority under the Clean Water Act. And if the owners of those old mine sites are recalcitrant, they can bring in and don't want to clean up the state or EPA. Or actually, Joe Citizen can go in and file an enforcement action under the Clean Water Act and get those sites cleaned up and get them to reduce their standards. EPA is a plenary authority under the Clean Water Act to require people to get permits to match the TMDL, the TMDL. The Pronsolino and the Myberg case from the 11th Circuit talk about discharges have to be in compliance with the TMDL system. And these these are not, Your Honor. The stream may be up by Gibson will get better. But in the long run, this is basically a death warrant for Pinto Creek. There's no plan to clean anything up. They're going to allow this big new mine to come up many thousands of acres, put more copper into the stream and then walk away. There's no plan to do anything. All right. Thank you. Thank you very much, Your Honor. The case just heard will be submitted and the Court will be in recess.
judges: Hug, Tashima, Gould